**SIGNED THIS: September 27, 2012**

_____
**Mary P. Gorman
United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 10-73865 |
| ROBERT J. PRINTZ and | ) | |
| JULIE M. PRINTZ, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| CNH CAPITAL AMERICA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 11-7054 |
| | ) | |
| TRAINOR GRAIN AND SUPPLY CO.; | ) | |
| BANK OF PONTIAC, AS SUCCESSOR | ) | |
| IN INTEREST TO BANK OF DWIGHT; | ) | |
| JOHN FRANCIS GSCHWENDTNER; | ) | |
| ROBERT J. PRINTZ; and | ) | |
| JULIE M. PRINTZ, | ) | |
| | ) | |
| Defendants. | ) | |

# OPINION

Before the Court is a Motion for Summary Judgment filed by CNH Capital America LLC ("CNH"), which in its Amended Complaint seeks a finding against Trainor Grain and Supply Co. ("Trainor") that CNH holds a first-priority perfected security interest in $362,443.49 which Trainor set off against money it owed to Robert J. Printz and Julie M. Printz ("Debtors"). For the reasons set forth below, CNH's Motion for Summary Judgment will be granted. Judgment will be entered in CNH's favor and against Trainor for $362,443.49.

## I. Factual and Procedural Background

The material facts of this case are undisputed. CNH and Trainor are creditors of the Debtors. Trainor is a grain elevator company which over the course of several years purchased grain from Debtors and provided Debtors with farm inputs to aid in Debtors' farming operations. CNH is a financial institution specializing in agricultural and construction financing and is a secured creditor of the Debtors, having lent money for farm inputs for crop years 2009 and 2010.

Debtors and CNH were parties to three CNH Capital Ag Resource Plus℠ Lines of Credit and Security Agreements. Two of these agreements are dated November 13, 2008. One agreement documented a loan to Debtors to pay off a preexisting operating loan with another lender, and the other agreement documented a loan for the 2009 crop year. The third agreement is dated January 12, 2010, and is for a loan for the 2010 crop year. All three agreements grant CNH a security interest in specific crops and proceeds from those crops. In addition, they grant CNH a security interest in other items of property Debtors then owned or thereafter would acquire, including "all accounts, general intangibles, chattel paper, leases, instruments, documents, investment property, agreements, drafts, acceptances, milk contract rights, and all other forms of obligations or receivables . . . ." CNH filed a UCC Financing Statement on November 24, 2008, to perfect its security interest in the Debtors'

crops, proceeds, and other personal property. In the agreements with CNH, Debtors identified Trainor as a potential purchaser of their crops. Accordingly, in four separate letters, two of which are dated August 10, 2009, and two of which are dated July 16, 2010, CNH notified Trainor of CNH's lien on Debtors' crops.

On April 23, 2009, at the request of CNH, Trainor released a UCC Financing Statement it had previously filed on April 26, 2006, which referenced a security interest Trainor held in Debtors' crops. The next day, Trainor filed a new UCC Financing Statement referencing its security interest in Debtors' crops.

During 2010, Trainor executed four written crop purchase contracts with Debtors. The first crop purchase contract was dated July 30, 2010, pursuant to which Debtors were to deliver to Trainor 100,000 bushels of corn at $3.70 per bushel. The second crop purchase contract was dated August 5, 2010, and called for Debtors to deliver to Trainor another 100,000 bushels of corn at a price of $3.80 per bushel. The third crop purchase contract also was dated August 5, 2010, and called for Debtors to sell Trainor another 100,000 bushels of corn, this time at a price of $3.90 per bushel. The fourth crop purchase contract likewise was dated August 5, 2010, pursuant to which Debtors were to deliver to Trainor 25,000 bushels of soybeans at a price of $10.00 per bushel. Debtors delivered all the corn and soybeans due under all four crop purchase contracts.

Separately, between January 1, 2006, and December 31, 2010, Trainor and Debtors entered into a series of verbal agreements whereby Trainor provided to Debtors various farming inputs, such as lime, potash, and other fertilizers and chemicals. In late 2010 when Debtors failed to pay Trainor for the inputs, Trainor retained the sum of $362,443.49 from the proceeds due to the Debtors under the corn and soybean purchase contracts and applied the retained funds to the amounts Debtors owed.

Debtors filed their voluntary petition under Chapter 11 on December 31, 2010. CNH filed

this adversary proceeding on April 4, 2011. CNH filed its Amended Complaint on January 12, 2012.[1] In the Amended Complaint, CNH seeks a determination of the validity, priority, and extent of the competing liens and interests of CNH and Trainor in the funds set off by Trainor from the proceeds of the corn and soybeans delivered by the Debtors to Trainor in 2010. CNH seeks turnover of the withheld funds from Trainor. CNH also seeks a determination that none of the other named Defendants, including the Debtors, hold an interest superior to CNH in the disputed funds.[2]

Trainor answered the Amended Complaint by denying some of the material allegations set forth therein and by raising the affirmative defense that it has a superior interest in the funds it set off pursuant to the provisions of the federal Food Security Act of 1985. Additionally, Trainor asserted that its contracts with the Debtors for the delivery of corn and soybeans provide it with a right of setoff.

Discovery is complete. CNH filed its Motion for Summary Judgment alleging that there are no material facts in dispute and that it is entitled to judgment in its favor as a matter of law. Trainor has responded by agreeing that no material facts are in dispute but claiming that it is entitled to judgment as a matter of law. The issues have been fully briefed and are ready for decision.

---

[1] Debtors' Motion to Dismiss their underlying bankruptcy case was granted on March 13, 2012. The dismissal of the Chapter 11 case does not automatically require the dismissal of all pending, related adversary cases. *See Chapman v. Currie Motors, Inc.*, 65 F.3d 78, 81 (7th Cir. 1995); *In re Statistical Tabulating Corp.*, 60 F.3d 1286, 1287 n.1 (7th Cir. 1995). After discussing the issues with the attorneys for both CNH and Trainor, this Court exercised its discretion to retain this case, as discovery was essentially complete and the parties had already reported their expectation that the issues could be resolved by summary judgment. The factors of judicial economy and convenience cited in the above cases weighed heavily in this Court's decision not to dismiss this case and, thereby, require the parties to start over in state court.

[2] CNH seeks summary judgment against Trainor but not against any of the other named Defendants. None of the other Defendants answered the Amended Complaint. A Motion for Default Judgment as to those Defendants may be needed to accord full relief to CNH.

## II. Jurisdiction

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §1334. The determination of the validity, priority, or extent of liens is a core proceeding. *See* 28 U.S.C. §157(b)(2)(K).[3]

## III. Legal Analysis

### A. Summary Judgment Standards

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. *See* Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056. Summary judgment is an efficient method for resolving disputes and summary judgment should be granted when the movant shows that there is no genuine dispute about any material fact and that the controlling substantive law demands a result in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A judge's function in evaluating a motion for summary judgment is not to weigh the evidence, but merely to determine whether there is a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is material only if its resolution might be case-determinative. *See Frey v. Fraser Yachts*, 29 F.3d 1153, 1156 (7th Cir. 1994). The movant bears the burden of establishing that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

---

[3] In its Complaint and Amended Complaint, CNH plead that this Court had jurisdiction to hear and decide the issues presented. Trainor admitted CNH's allegations regarding jurisdiction in its Answers. During a hearing held March 1, 2012, this Court raised, *sua sponte*, the issue of whether there were jurisdictional or constitutional impediments to this Court entering a final order or judgment in the case where the relief sought is based exclusively on non-bankruptcy law and the underlying bankruptcy case was expected to be dismissed. *See Stern v. Marshall*, __ U.S. __ , 131 S. Ct. 2594, 2620 (2011). The attorneys for both CNH and Trainor responded that they consented to this Court proceeding to hear the case. Satisfied that there is authority to do so, this Court will enter a final order and judgment in this case. To the extent later challenged, however, this Opinion shall constitute proposed findings of fact and conclusions of law for the District Court to consider.

U.S. 574, 585-86 (1986).

Here, both parties agree that there are no material facts in dispute and in its Response to CNH's Motion for Summary Judgment, Trainor specifically acknowledges that resolution of the case by summary judgment is appropriate. Having reviewed all documents filed by the parties on the disputed issues, this Court agrees that there are no material issues of fact in dispute and that the parties have correctly identified the issues here as ones that can be resolved as a matter of law on CNH's Motion for Summary Judgment.

      **B.    CNH Has a Valid, Perfected, First-Priority Security Interest in Debtors' 2009 and 2010 Crops and Crop Proceeds under Illinois Law.**

CNH claims a valid, perfected, first-priority security interest in the Debtors' 2009 and 2010 crops and the proceeds from the sale of those crops. It is not disputed that CNH and the Debtors executed loan documents for both the 2009 and 2010 crop years and that CNH advanced funds pursuant to those documents. It is also not disputed that the Debtors executed security agreements with CNH pledging, *inter alia*, their 2009 and 2010 crops and the proceeds of those crops and that CNH filed a UCC Financing Statement with the Illinois Secretary of State on November 24, 2008, which identified its lien on the Debtors' crops and proceeds. Trainor admits that its financing statement, filed to perfect a lien on the Debtors' crops at issue here, was not filed until April 24, 2009. Trainor also admits that it released its previously filed financing statement at the insistence of CNH with full knowledge that the release would place CNH in first place as to the future crops and crop proceeds of the Debtors.

In Illinois, a security interest is enforceable when the secured party has given value, the debtor has rights in the collateral, and the debtor has authenticated a security agreement that describes the collateral. *See* 810 ILCS 5/9-203(b). To be fully effective against third parties, a security interest must be perfected and agricultural liens are perfected by the filing of financing

statements. *See* 810 ILCS 5/9-310(a). Once properly perfected, a security interest in agricultural products continues notwithstanding the sale of those products and the perfected interest also attaches to the proceeds of sale. *See* 810 ILCS 5/9-315(a). In the event of a dispute between competing secured creditors, the first perfected interest to attach has priority. *See* 810 ILCS 5/9-322.

When this statutory framework is applied to the undisputed facts here, it is clear that CNH had a valid, perfected, first-priority security interest in the Debtors' 2009 and 2010 crops and the proceeds from sale of those crops. Trainor does not truly dispute that fact but claims that the provisions of the federal Food Security Act of 1985 change the result here. The applicability of the Food Security Act will be discussed below. But, in order to even move on to that issue, the threshold issue of whether CNH has properly created the lien it claims on the Debtors' crops and proceeds must be determined. CNH has met its burden and has established as a matter of law that it holds a valid, perfected, first-priority security interest in the Debtors' 2009 and 2010 crops and the proceeds from the sale of those crops.

### C. The Food Security Act Does Not Provide Trainor Authority for its Setoff.

The Food Security Act of 1985 ("FSA") includes, *inter alia*, a section which is designed to protect buyers who purchase farm products in the ordinary course of business. *See* 7 U.S.C. §1631. In enacting the FSA, Congress found that purchasers of farm products in the ordinary course of business were being exposed to a risk of double payment when sellers failed to remit the sale proceeds to the sellers' lenders, causing lenders to pursue payment from buyers. *See* 7 U.S.C. §§1631(a)(1)-(3); *Fin Ag, Inc. v. Hufnagle, Inc.*, 700 N.W.2d 510, 516 (Minn. Ct. App. 2005). This practice burdened interstate commerce and the FSA was enacted to fix the problem. *See* 7 U.S.C. §1631(c)(4). The FSA is at the heart of the dispute between CNH and Trainor.

In response to CNH's Motion for Summary Judgment, Trainor insists it was a buyer in the

ordinary course of business under the FSA and that it took the corn and soybeans it purchased from Debtors in 2010 free and clear of CNH's lien. Trainor avers that CNH's lien would have survived only if CNH had provided Trainor with proper notice of the lien. In Trainor's view, CNH's attempt to provide notice to Trainor was insufficient, and so it took the crops free of CNH's lien.

The relevant provisions of the FSA provide:

> (d) Purchases free of security interest
>
> Except as provided in subsection (e) of this section and notwithstanding any other provision of Federal, State, or local law, a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, even though the security interest is perfected; and the buyer knows of the existence of such interest.
>
> (e) Purchases subject to security interest
>
> A buyer of farm products takes subject to a security interest created by the seller if - -
>
>> (1)(A) within 1 year before the sale of the farm products, the buyer has received from the secured party or the seller written notice of the security interest organized according to farm products that - -
>>
>>> (i) is an original or reproduced copy thereof;
>>>
>>> (ii) contains,
>>>
>>>> (I) the name and address of the secured party;
>>>>
>>>> (II) the name and address of the person indebted to the secured party;
>>>>
>>>> (III) the social security number, or other approved unique identifier, of the debtor or, in the case of a debtor doing business other than as an individual, the Internal Revenue Service taxpayer identification number, or other approved unique identifier, of such debtor; and
>>>>
>>>> (IV) a description of the farm products subject to the

-8-

> security interest created by the debtor, including the amount of such products where applicable, crop year, and the name of each county or parish in which the farm products are produced or located;
>
> (iii) must be amended in writing, within 3 months, similarly signed, authorized, or otherwise authenticated and transmitted, to reflect material changes;
>
> (iv) will lapse on either the expiration period of the statement or the transmission of a notice signed, authorized, or otherwise authenticated by the secured party that the statement has lapsed, whichever occurs first; and
>
> (v) contains any payment obligations imposed on the buyer by the secured party as conditions for waiver or release of the security interest[.]

7 U.S.C. §1631(d), (e).

Under the FSA, a "buyer in the ordinary course of business" is defined as "a person who, in the ordinary course of business, buys farm products from a person engaged in farming operations who is in the business of selling farm products." 7 U.S.C. §1631(c)(1). A "security interest" refers to "an interest in farm products that secures payment or performance of an obligation." 7 U.S.C. §1631(c)(7). Corn and soybeans are expressly designated as "farm products." 7 U.S.C. §1631(c)(5).

There is no dispute that under state law, CNH held a perfected security interest in Debtors' crops, including the corn and soybeans sold to Trainor. Trainor, a grain elevator company, was engaged in the ordinary course of business when it purchased the corn and soybeans from Debtors, and Debtors were engaged in farming operations and in the business of selling farm products. *See* 7 U.S.C. §1631(c)(1). The FSA provides a manner for holders of state law liens to protect their interests in farm products, but the undisputed facts demonstrate that CNH failed to avail itself of this protection. Specifically, CNH's notices to Trainor all failed to include Debtors' social security numbers and a proper description of the crops subject to CNH's security interest. *See* 7 U.S.C.

-9-

§1631(e)(1).[4] The weight of authority is that anything less than complete and precise compliance with the notice provisions of §1631(e)(1) is insufficient. *See Farm Credit Midsouth, PCA v. Farm Fresh Catfish Co.*, 371 F.3d 450, 454 (8th Cir. 2004); *State Bank of Cherry v. CGB Enters., Inc.*, 964 N.E.2d 604, 611 (Ill. App. Ct. 2012).

In fact, CNH makes no attempt to claim that its notice was sufficient under the FSA. CNH only claims that Trainor was not a buyer in the ordinary course entitled to the protections of the FSA because its intent in buying the Debtors' crops was to use the sale proceeds to satisfy the Debtors' obligations for inputs. But, the timing of the contracts suggests otherwise and, in any event, the issue of Trainor's status as a buyer or creditor is best discussed in the context of whether the FSA protects Trainor's setoff in addition to its clear title to the crops. Accordingly, this Court will find that the FSA supports Trainor's claim that it took the corn and soybeans delivered in 2010 by the Debtors free and clear of CNH's security interest.

Trainor's victory on that issue may be Pyrrhic, however, because this Court must also find that the FSA does not support Trainor's contention that it took both the grain *and* the proceeds free of CNH's lien. The statutory protections for buyers of farm products that Trainor relies on provide that the "security interest" that such buyers take free and clear of is limited to an interest in the farm products and does not include an interest in the proceeds of those products. *See* 7 U.S.C. §1631(c)(7).

To support its position that it holds the setoff funds free of CNH's lien, Trainor compares §1631(d) and §1631(g) and notes a slight difference in language between them. Subsection (d) provides that "a buyer who in the ordinary course of business buys a farm product from a seller

---

[4] Illinois has not established a central filing system, so the alternate method for lienholders to protect their interests in farm products provide by §§1631(e)(2) and (3) are not relevant to this Court's inquiry and can provide CNH no relief here. *See* 7 U.S.C. §§1631(e)(2), (3); *First Midwest Bank v. IBP, Inc.*, 731 N.E.2d 839, 842 (Ill. App. Ct. 2000).

engaged in farming operations shall take free of *a security interest created by the seller . . . .*" 7 U.S.C. §1631(d) (emphasis supplied). Subsection (g) says in pertinent part, "a commission merchant or selling agent who sells, in the ordinary course of business, a farm product for others, shall not be subject to a security interest created by the seller *in such farm product . . . .*" 7 U.S.C. §1631(g). Trainor argues that the difference between these two subsections means that a commission merchant or selling agent takes free only of the security interest in the farm product, whereas a buyer takes free of the security interest in the farm product and the proceeds. Trainor cites a single case, from the State of Washington, in support of this view. *See Food Servs. of Am. v. Royal Heights, Inc.*, 850 P.2d 585, 588 n.2 (Wash. Ct. App. 1993).

Trainor's argument is unpersuasive. The *Royal Heights* court expressly declined to rule on the same argument Trainor presents here. And, more important, Trainor's argument is inconsistent with the statutory text. As already explained, a "security interest" is a defined term which denotes "an interest in farm products that secures payment or performance of an obligation." 7 U.S.C. §1631(c)(7). The definition excludes any reference to an interest in the proceeds of farm products, an exclusion which presumably was intentional. *Russello v. United States*, 464 U.S. 16, 23 (1983) (courts generally presume Congress acts intentionally when it includes or excludes language in a statute). Whatever the significance of the difference in language between §1631(d) and §1631(g), if any, Trainor's interpretation conflicts with the FSA definition of "security interest" by trying to expand its coverage to include the proceeds of farm products.

Trainor's view also is inconsistent with the history and purpose of the FSA as it relates to protection for purchasers of farm products. The primary problem Congress intended to remedy was a situation in which a buyer purchases farm products unaware that the sale violates a third party's security interest in those products, pays the seller for the products, and then exposes itself to liability for double payment when the third party lienholder sues the buyer because the seller never remitted

the proceeds from the collateral to the lienholder. *See* 7 U.S.C. §1631(a). In this case, there is no risk to Trainor of the double payment scenario because Trainor never paid Debtors the proceeds due under the crop purchase contracts in the first place.

Further, nothing suggests that Congress intended the FSA be used to create a windfall for buyers by allowing buyers to set off unrelated preexisting debt and thereby also take priority over earlier-in-time perfected liens on the proceeds. The reason is that the FSA does not "preempt basic state-law rules on the creation, perfection, or priority of security interests." H.R. Rep. No. 99-271(I), at 110, *reprinted in* 1985 U.S.C.C.A.N. 1103, 1211; *see Farmers & Merchs. State Bank v. Teveldal*, 524 N.W.2d 874, 878-79 (S.D. 1994). If Trainor could use the FSA to exercise setoff rights and thereby obtain priority over CNH's interest in the proceeds, the FSA would become an instrument for circumventing state law on the creation, perfection, and priority of security interests.

Another reason Trainor's setoff places it outside the scope of a buyer in the ordinary course is that when Trainor set off the preexisting debt Debtors owed to it, Trainor was no longer acting as a buyer, but rather as a creditor. In a case with similar facts, one court held that a hog purchaser was protected under the FSA as a buyer in the ordinary course to the extent that it purchased the hogs and paid the seller without having received proper notice of the lienholder's interest in the hogs. *Consolidated Nutrition v. IBP, Inc.*, 669 N.W.2d 126, 127 (S.D. 2003). But, the court held that the FSA granted the purchaser no right to act as a creditor and set off debt that had previously accumulated in a "deficiency account" under the same hog procurement contract. *Id.* at 127-28, 131.

Similarly, in *Food Services of America v. Royal Heights, Inc.*, the court held that commission merchants and selling agents are not subject to the seller's security interest in the crops to the extent they sell those products to others in the ordinary course of business, but are unprotected to the extent that the commission merchant or selling agent applies the proceeds from the collateral to set off a separate debt for which it is a secured creditor. *Food Servs. of Am. v. Royal Heights, Inc.*, 871 P.2d

590, 591, 597 (Wash. 1994).[5] As the *Royal Heights* court stated, giving FSA protection to setoffs would render "insecure the security interest *of all first-in-time agricultural lenders*," such as CNH in this case. *Id.* at 596 (emphasis in original). Like *Consolidated Nutrition* and *Royal Heights*, other courts have similarly accepted the distinction between an entity's actions as a buyer in the ordinary course, which the FSA protects, and that entity's actions as a lender in using the collateral proceeds to satisfy other debt, which the FSA does not protect. *See, e.g.*, *Battle Creek State Bank v. Preusker*, 571 N.W.2d 294, 299-300 (Neb. 1997); *see also Cornerstone Bank and Trust v. Consol. Grain and Barge Co.*, 956 N.E.2d 944, 952-53 (Ill. App. Ct. 2011) (implicitly accepting the Washington Supreme Court's *Royal Heights* analysis while finding that the case at bar was factually distinguishable because Cornerstone Bank and Trust never acted as a creditor).

In summary, neither the express provisions nor the spirit of the FSA provide authority for Trainor's setoff of the proceeds from its purchases from the Debtors. CNH had a valid, perfected, first-priority lien on those proceeds. If Trainor had paid the proceeds to the Debtors, CNH would have had no claim against Trainor for the proceeds or the crops delivered. But having kept the crops *and* the money, Trainor cannot prevail. Its claimed affirmative defense under the FSA must be denied. No provision of the FSA limits the right of CNH to obtain turnover of the funds from Trainor.

### D. Trainor's Contractual Rights Do Not Trump CNH's Security Interest in the Setoff Funds.

In claiming a superior interest in the setoff funds, Trainor relies on the fact that its four crop purchase contracts with the Debtors each contain a provision granting Trainor the authority to

---

[5] This case is the appeal to the Washington Supreme Court taken from the *Royal Heights* case cited *supra*. The Washington Supreme Court affirmed the Washington Court of Appeals. 871 P.2d at 598.

exercise setoff rights. The provision states, "Buyer shall also have the right to offset any monies otherwise payable to Seller against debts or charges due Buyer from Seller."[6] The crop purchase contracts between Debtors and Trainor also state in part: "This Contract may be assigned by Buyer, but expressly may NOT be assigned by Seller unless express written consent is first obtained from Buyer." Notwithstanding this anti-assignment provision, Trainor avers that CNH is the assignee of the crop purchase contracts and, accordingly, CNH's rights in the crop proceeds are subject to the terms of the crop purchase agreements which allow setoff.

Trainor relies on §9-404(a) of the Uniform Commercial Code, which provides:

> (a) Assignee's rights subject to terms, claims, and defenses; exceptions. Unless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (b) through (e), the rights of an assignee are subject to:
>
> > (1) *all terms of the agreement between the account debtor and assignor* and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and
> >
> > (2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

810 ILCS 5/9-404(a) (emphasis supplied).

The text of §9-404 and surrounding provisions of the Uniform Commercial Code, as well as case law, illustrate why Trainor's setoff can be avoided by CNH.[7] Article 9 of the Uniform Commercial Code generally does not apply to rights of recoupment or setoff, but §9-404 "applies

---

[6] Trainor's Response to CNH's Motion for Summary Judgment only mentions the first corn purchase contract, but the same analysis applies to the language in each contract.

[7] As adopted in Illinois, the portion of §9-404 at issue here remains substantially the same as when it was §9-318. 810 ILCS 5/9-318(1) (current version at 810 ILCS 5/9-404 (2001)); *see In re Doctors Hosp. of Hyde Park, Inc.*, 337 F.3d 951, 953 (7th Cir. 2003).

with respect to defenses or claims of an account debtor." 810 ILCS 5/9-109(d)(10)(B). An "account debtor" includes a "person obligated on an account ." 810 ILCS 5/9-102(a)(3). "An 'account debtor' is basically someone who owes money as a result of a contractual undertaking." *Doctors Hosp. of Hyde Park*, 337 F.3d at 953. An "account" includes "a right to payment of a monetary obligation, whether or not earned by performance … for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of . . . ." 810 ILCS 5/9-102(a)(2).

Section 9-404(a) uses two other undefined terms: "assignor" and "assignee." *See* 810 ILCS 5/9-404(a). Although Trainor's entire argument relies on these terms, Trainor fails to clarify the meaning of "assignor" and "assignee." Instead, Trainor just asserts that "[u]pon the grain sale, Trainor becomes the account debtor, [Debtors] the assignor, and CNH the assignee." And then based on that assertion, Trainor claims that the rights of CNH as "assignee" are subject to the right of setoff agreed to by the Debtors with Trainor.

Although "assignor" and "assignee" are undefined terms in the statute at issue here, a substantial body of case law explains that the principle articulated in §9-404(a)(1) is that when rights in property are transferred, the assignee takes no different or greater rights than the assignor and cannot be in a superior position to the assignor vis-a-vis the account debtor. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. U.S. Rent a Car, Inc.*, 2011 WL 3648225, at *4 (D. Minn. Aug. 17, 2011); *Iowa Oil Co. v. Citgo Petroleum Corp.* (*In re Iowa Oil Co.*), 2004 WL 2326377, at *6 (N.D. Iowa Sept. 30, 2004); *GMAC Commercial Credit LLC v. Springs Indus., Inc.*, 171 F.Supp. 2d 209, 214 (S.D.N.Y. 2001).

Under §9-404, one generally becomes an assignee either by taking a security interest in an account receivable in exchange for a loan or by purchasing part or all of the account receivable outright. *See Nat'l City Bank, Northwest v. Columbian Mut. Life. Ins. Co.*, 2000 WL 1675545, at *4 (N.D. Ohio Sept. 13, 2000). The applicability of §9-404 is the same in both situations. *See Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1190 (7th Cir. 1990).

The four crop purchase contracts are the agreements which Trainor says give its setoff rights priority over CNH's perfected security interest in the proceeds of Debtors' crops. Under those contracts, Trainor clearly was an account debtor in that it owed money under those contracts to Debtors for the crops Trainor was purchasing. *See* 810 ILCS 5/9-102(a)(2), (3). But, Debtors were never assignors and CNH was never an assignee. That is, CNH never *specifically* purchased or took a security interest in the accounts receivable created by those precise contracts. Rather, CNH's security interest arose in an earlier and separate agreement with Debtors, before the accounts receivable from the crop purchase contracts ever came into existence.

To say that a security interest in an after-acquired account receivable constitutes an assignment is to blend the two concepts and stretch §9-404's use of "assignee" and "assignor" too far beyond those terms' typical usage. Here, there was no express attempt on the part of Debtors to assign their rights or obligations under the crop purchase contracts to CNH and, again, the crop purchase contracts by their terms limited Debtors' ability to assign the contract. Additionally, the accounts receivable created by the crop purchase contracts did not exist when CNH and Debtors entered into their security agreements. Under these facts, the Court finds that no assignment occurred and thus that no part of §9-404(a) applies. As a result, §9-404(a) does not provide Trainor's contractual setoff rights priority over CNH's prior perfected security interest.

The case law supports this view. Numerous cases explain that §9-404(a) (or its predecessor, §9-318(1)) only applies when an entity takes either a security interest or outright ownership of an existing account receivable. *See, e.g.*, *First Nat'l Bank of Boston v. Thomson Consumer Elecs., Inc.*, 84 F.3d 397, 398-400 (11th Cir. 1996) (account receivable already in existence when security interest in it was granted); *GMAC Commercial Credit, LLC v. Dillard Dep't Stores, Inc.*, 198 F.R.D. 402, 407 (S.D.N.Y. 2001) (saying §9-318(1) is "the section pertaining to the rights of assignees of accounts receivable . . . ."). Further, to the extent that the provision has been used to protect a

purchaser or "account debtor" from the competing interest of a secured creditor, that has been done when the purchaser had no knowledge of the secured creditor's interest and to avoid the unfairness of a secured creditor of a seller imposing new or different terms on a purchaser with an existing contract. *See U.S. Aeroteam, Inc. v. Delphi Automotive Systems, LLC.* (*In re U.S. Aeroteam, Inc.*) 327 B.R. 852, 871 (Bankr. S.D. Ohio 2005). In situations such as presented here where CNH perfected first in time and Trainor – the "account debtor" – had actual knowledge of CNH's security interest before entering into the purchase contracts, the "first in time, first in right" rule continues to apply. *See MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 881 F.2d 615, 620 (2d Cir. 1989).

To condone Trainor's attempt to contract around CNH's prior perfected security interest under the circumstances presented here would be inconsistent with Article 9 because Article 9 is intended "'to create commercial certainty and predictability by allowing [creditors] to rely on the specific perfection and priority rules that govern collateral within the scope of Article 9.'" *Boatmen's Nat'l Bank of St. Louis v. Sears, Roebuck and Co.*, 106 F.3d 227, 230-31 (8th Cir. 1997) (alteration in original) (citation omitted). Trainor may not use §9-404(a) to contract around CNH's prior perfected security interest by way of an agreement to which CNH was never a party because it would undermine the commercial certainty Article 9 seeks to achieve.

The undisputed facts are that CNH's UCC Financing Statement was filed on November 24, 2008, whereas Trainor released its April 26, 2006, UCC Financing Statement on April 23, 2009, and then refiled a UCC Financing Statement on April 24, 2009. Thus, CNH was first in time and enjoys priority over Trainor's setoff rights.

### E. Prejudgment Interest

CNH claims that it is entitled to pre-judgment interest. CNH bases it claim solely on the Illinois Interest Act. *See* 815 ILCS 205/2.

The crop purchase contracts between Trainor and the Debtors contain no express provision allowing interest at a specified rate, so CNH turns to the statute for support. *See Premier Elec. Constr. Co. v. Am. Nat'l Bank of Chicago*, 658 N.E.2d 877, 888 (Ill. App. Ct. 1995). The Illinois Interest Act provides that "[c]reditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing . . . ." 815 ILCS 205/2. While awarding prejudgment interest often is routine, Trainor says CNH is not entitled to prejudgment interest in this case because Debtors, not CNH, were the payees under the crop purchase contracts.

Trainor is correct insofar as it argues that the Illinois Interest Act requires that a creditor-debtor relationship must have existed between the parties. *Liberty Mut. Ins. Co. v. Decking and Steel, Inc.*, 301 F.Supp.2d 830, 834 (N.D. Ill. 2004); *La Grange Metal Prods. v. Pettibone Mulliken Corp.*, 436 N.E.2d 645, 652 (Ill. App. Ct. 1982); *North Shore Marine, Inc. v. Engel*, 401 N.E.2d 269, 273 (Ill. App. Ct. 1980). In this case, the contracts on which CNH rests its prejudgment interest claim created a creditor-debtor relationship between Debtors and Trainor, not CNH and Trainor. At no point did Debtors assign their rights or obligations under the crop purchase contracts to CNH. CNH prevailed on this very argument in alleging that §9-404 does not apply to this action. Even though CNH had a security interest in after-acquired accounts receivable and may have had a right to enforce the crop purchase contracts under the Uniform Commercial Code, this does not rise to the level of creating a creditor-debtor relationship between CNH and Trainor, as contemplated by the Illinois Interest Act. For these reasons, CNH will be denied prejudgment interest under the Illinois Interest Act. CNH made no claim to interest under any other provision of state or federal law and, accordingly, this Court will not award interest under any other theory.

### IV. Conclusion

CNH has established a valid, perfected, first-priority security interest in the Debtors' 2009 and 2010 crops and crop proceeds. Trainor set off $362,443.49 in crop proceeds despite the fact that its lien on such proceeds under Illinois law was second in time and, therefore, inferior to CNH's lien. Trainor's defenses under the FSA and its crop purchase contracts cannot be sustained. Accordingly, CNH's Motion for Summary Judgment will be granted in part. An order will be entered in favor of CNH and against Trainor finding that CNH's interest in the setoff funds is superior to the interest of Trainor and requiring Trainor to turn over to CNH the sum of $362,443.49. CNH will be denied its additional claim for interest on the funds.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###